26072. LIBERTY MUTUAL INSURANCE CO. *v.* NEAL.

DECIDED APRIL 19, 1937. REHEARING DENIED MAY 22, 1937.

*Neely, Marshall & Greene,* for plaintiff in error.

*Sam S. Harben, Boyd Sloan,* contra.

SUTTON, J. It is contended by the plaintiff in error that there was not sufficient evidence to warrant a finding that at the time of his injury the claimant was working for the Gainesville Cotton Mills. It is undisputed that he was injured at the time and in the manner claimed, but it is argued that such an injury did not arise out of and in the course of his employment with the de-

fendant mill, and that on the contrary his injury was sustained while he was working for one who happened to be the outside overseer of the mill. Of course, "the fact that an employee is the general servant of one employer does not, as matter of law, prevent him from becoming the particular servant of another, who may become liable for his acts. And it is true as a general proposition that when one person lends his servant to another for a particular employment (or hires him), the servant, for anything done in that particular employment, must be dealt with as the servant of the man to whom he is lent (or hired), although he remains the general servant of the person who lent him (or hired him)." 18 R. C. L. 784. *Greenberg & Bond Co.* v. *Yarbrough,* 26 *Ga. App.* 544 (106 S. E. 624). This principle is so uniform and so well understood that quotations from other authorities are unnecessary. The difficulty lies not so much as to the principle, but as to its application to particular facts in a given case. The claimant contends that he was in the exclusive employment of the mill from the time he reported for work at eight o'clock on the morning of the accident until and after he sustained his injury, and that the work he was performing on the farm of the overseer Knickerbocker was in the course of and arose out of his employment with the mill. Knickerbocker was shown to have been vested with full authority as to all outside matters of the mill. In such a capacity he not only directed the matters of receiving cotton and stripping the same, hauling cotton and other things, directing and controlling labor on the outside, but had "been buying wood from any number of people for the last few years," for the mill, for resale through its commissary. Just as the mill used cordwood from others, it used wood from its overseer Knickerbocker, paying him the usual price of $3 per cord. Sometimes the price paid others was less than $3, and sometimes more. Knickerbocker's numerous purchases were impliedly ratified by the mill. It is also a reasonable inference, in view of the well-known efforts of cotton-mills nowadays to insure the comfort and welfare of their employees, that the mill was desirous of having on hand at all times, especially in winter, an adequate supply of cord-wood for resale to its employees. How much wood was on hand the day the claimant was injured, and whether or not more wood was then desirable, is not shown, but such a consideration is not neces-

sarily important. Suffice it to say that Knickerbocker was apparently the mill's instrumentality in obtaining much cord-wood. Whether on a given occasion he purchased wood from Jones or Brown or Green or from himself was immaterial, so long as the commissary was provided with that commodity for resale. But the acquisition of cord-wood presupposes the cutting of wood by somebody, and conceivably, though not necessarily, it might be of interest to the mill to aid a seller of wood by occasionally furnishing, at its own expense, a laborer to cut the wood which it desired to purchase, notwithstanding that such contribution of service might increase the usual cost of $3 per cord. If Knickerbocker, who was the agent of the mill in obtaining wood, could provide Jones or Brown or Green with one of the mill's outside laborers, free of expense to the seller, there is no reason why he could not, if entirely in good faith with the mill, and even in the absence of it, so far as the laborer is concerned, furnish himself with a laborer at the expense of the mill on a given occasion.

Knickerbocker, however, denied that he had ever used the mill's property or its employees at the mill's expense, and the mill's assistant secretary and treasurer testified that, so far as he knew, Knickerbocker had no such authority. That, however, was only his own personal construction of the extent of Knickerbocker's authority. The mill superintendent testified that Knickerbocker would have been discharged if such use of the mill's property or employees had come to his attention. That, too, was only a conclusion on the part of the witness; and, in the absence of any express instructions to Knickerbocker as to what he could not do, the real question is whether or not, in the scope of his employment as outside overseer, and as one who had purchased much wood for the mill's commissary, he was authorized, in the exercise of his own judgment as agent for the mill, to provide himself with a laborer from the mill and thereby expedite or make available the supply of cord-wood for the mill. Despite the dual capacity in which he would be thereby placed, we hold that such an act would not necessarily be beyond the scope of his employment. If that be true, as we hold it is, it necessarily follows that the claimant, who was under the control of Knickerbocker and of his second hand, Wallace Nix, who repeated instructions of Knickerbocker, was likewise in the scope of his duties in executing the orders of his

superior. In issuing instructions for the cutting of wood under such circumstances Knickerbocker would not be a fellow servant of the laborer, but a vice-principal of the master, the defendant mill. "The term 'vice-principal,' as used in the fellow-servant law, has been defined as including any servant who represents the master in the discharge of those personal or absolute duties which every master owes to his servants; such duties being often referred to as the non-assignable duties of a master. . . Among the non-assignable duties of the master are, providing machinery and appliances, *the place to work,* the inspection and repair of premises and appliances, *the selection and retention of servants,* the establishment of proper rules and regulations, and *the instruction of servants.* This enumeration, however, is not exhaustive, but simply illustrative." (Italics ours.) *Moore* v. *Dublin Cotton Mills,* 127 *Ga.* 609, 616 (56 S. E. 839, 10 L. R. A. (N. S.) 772). In the same case it was said: "A servant is bound to obey the order of his master unless the command includes a violation of the law, or the act required is so obviously dangerous that no person of ordinary prudence would undertake to perform it. Where the master himself gives the order and the servant obeys it, and is injured as a consequence thereof, of course the master is liable. If the order is given by a representative of the master, who occupies towards him the position of vice-principal, the same result follows. . . A mere servant can not become a vice-principal by an usurpation of authority which the master has not conferred upon him. . . If another servant is injured by his conduct [that of a fellow servant] when he speaks for the master, the master is liable." There was no evidence of express authority from the master to Knickerbocker that the scope of his duties included the sending of the mill's laborers to cut wood; but, as said above, we are constrained to hold that in the mill's enterprise of furnishing wood through its commissary, with Knickerbocker in charge of all outside matters and purchasing much wood with the implied ratification of the mill, his act in sending the claimant to cut wood on his farm, if he did send him, at the mill's expense, was not without the scope of his duties as vice-principal of the master, and the act of the claimant in going was not without the scope of his duties as a mill laborer.

The Department of Industrial Relations found that in going to

the farm of Knickerbocker and cutting wood the claimant was working for the mill. To support that finding the commission had evidence before it that the mill had in fact paid the claimant for the full week in which the injury occurred. Though not conclusive, this was a circumstance which the commission might consider in connection with the claimant's testimony that nothing was said to him as to working for Knickerbocker personally, and that in going to the farm and cutting wood he was working for the mill, doing what his bosses told him to do. The evidence further shows that Knickerbocker was not present at the farm when the claimant reached there on the wagon or truck of the mill, accompanied by Wallace Nix, the second hand, and that it was the latter who, on the premises, told the claimant and others to begin cutting wood. Witnesses for the mill testified that the claimant was sent to work for Knickerbocker personally, that he was so informed at the time, had asked to go, and that the hours for which he was paid in excess of the actual time made at the mill on the morning of the injury, and for the particular week in which the injury was sustained, did not include the time spent at Knickerbocker's farm, but that, to make out a full week, overtime otherwise accumulated was taken into account. It was testified that such. overtime was shown by time-sheets apart from the pay-roll book which showed that the claimant made a full week at the mill, but such time-sheets were not produced before the commission. One of the mill's witnesses testified, as his own conclusion, that the claimant made overtime in the particular week, because he worked on a truck which made overtime. In such a conflict the commission was authorized to find, from the implied authority of the claimant's superior, a vice-principal of the master, and the payment of a full week's wages, that he was paid for the time spent at the farm of Knickerbocker, and that thereby the mill had ratified the act of the vice-principal in sending him there to work. "A ratification by the principal shall relate back to the act ratified, and shall take effect as if originally authorized. A ratification may be express, or implied from the acts or silence of the principal. A ratification once made may not be revoked." Code, § 4-303. In *Moore* v. *Ross*, 41 *Ga. App.* 509 (153 S. E. 575), it was held: "But if the servant, in obedience to an express command of the master, or at the command or request of another

servant having either express or implied authority to make such command or request, performs an act within the scope of the master's business, which would not, but for the command, lie strictly within the scope of the servant's particular employment, he will still, by reason of his obedience to the command, be deemed to be acting within the line of his duty and employment, since the command given by the master, or by another servant having authority to give such command, will serve to enlarge the scope of the employment to include the act done in obedience thereto." That decision dealt with a demurrer to a petition in which it was alleged that the person giving the command was acting in the scope of his authority and in and about the master's business in ordering the person injured to do certain work for which he was not expressly employed, and the allegation was necessarily taken as true for the purpose of the demurrer. In the present case we have held that Knickerbocker was a vice-principal of the mill, authorized to speak for the master, and that he was acting in the scope of his employment and in and about his master's business in sending the claimant to cut wood to make available a supply of cord-wood for the commissary of the mill. Under the principle announced in *Moore* v. *Ross, supra,* the claimant's work was thereby broadened, even if it be assumed that his duties originally did not include such work.

It is well settled that the finding of the Department of Industrial Relations on questions of fact, if supported by any evidence, is conclusive. *Ocean Accident & Guaranty Corporation* v. *Council,* 35 *Ga. App.* 632 (2) (134 S. E. 331), and cit.; *Johnson* v. *American Mutual Liability Insurance Co.,* 50 *Ga. App.* 54 (176 S. E. 907). It is also the rule that the workmen's compensation act shall be liberally construed in determining whether a particular employment is within its provisions. *New Amsterdam Casualty Co.* v. *Sumrell,* 30 *Ga. App.* 682, 689 (118 S. E. 786); *Pridgen* v. *Murphy,* 44 *Ga. App.* 147, 149 (160 S. E. 701). In *New Amsterdam Casualty Co.* v. *Sumrell, supra,* it was said, quoting from a leading Massachusetts case: "It is sufficient to say that an injury is received 'in the course of' the employment when it comes while the workman is doing the duty which he is employed to perform. It 'arises out of' the employment, when there is apparent to the rational mind, upon consideration of all

the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury. Under this test, if the injury can be seen to have followed as a natural incident of the work, and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment, then it arises 'out of' the employment. But it excludes an injury which can not fairly be traced to the employment as a contributing proximate cause, and which comes from a hazard to which the workmen would have been equally exposed apart from the employment. The causative danger must be peculiar to the work, and not common to the neighborhood. It must be incidental to the character of the business, and not independent of the relation of master and servant. It need not have been foreseen or expected, but after the event it must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence." See also *Employers Liability Assurance Corporation* v. *Montgomery*, 45 *Ga. App.* 634 (165 S. E. 903). "Under the workmen's compensation law, an employee is entitled to compensation for injuries from accidents arising out of and in the course of the employment; that is, for such occurrences as might have been reasonably contemplated by the employer as a risk naturally incident to the nature of the employment, or such as, after the event, might be seen to have had its origin in a risk connected with the business of the employment, and to have arisen out of and flowed from that source as a natural consequence." *United States Fidelity & Guaranty Co.* v. *Green,* 38 *Ga. App.* 50 (142 S. E. 464), citing *Keen* v. *New Amsterdam Casualty Co.,* 34 *Ga. App.* 257 (2) (129 S. E. 174). The evidence, though conflicting, was sufficient to authorize the finding of the director and the affirmance thereof by the full board of the Department of Industrial Relations, and the judgment of the superior court affirming the award was not error.

*Judgment affirmed. Stephens, P. J., concurs. Felton, J., dissents.*