FRIED, for use, *et al.* v. UNITED STATES FIDELITY AND GUARANTY COMPANY *et al.*

No. 13679. JUNE 18, 1941. REHEARING DENIED JULY 10, 1941.

*Hall & Bloch,* for plaintiffs.

*Anderson, Anderson & Walker,* for defendants.

ATKINSON, Presiding Justice. This case arose in a claim filed by Mrs. Esther A. Fried on behalf of herself and minor children, against Fried's Garage as employer, and United States Fidelity and Guaranty Company as insurance carrier, under the workmen's compensation act.

Theodore D. Fried died on April 26, 1939, as a result of an attack made on him the previous night by Gordon Bush, at a time when it is claimed that Fried was acting within the scope of his duties as manager of the tire department of Fried's Garage.

The claim was tried before a director of the Industrial Board. He found that the death was accidental within the workmen's compensation act; that it arose in the course of Fried's employment, but did not arise out of his employment; that the injury was due to his own wilful misconduct; and that it was caused by the wilful act of a third person directed against the employee, for reasons personal to the employee, and therefore was not compensable. The board affirmed this award, denying compensation. The judge of the superior court reversed these findings and held that the claimant was entitled to compensation. On writ of error the Court of Appeals reversed the judgment of the superior court, and the finding of the board of the Industrial Commission was affirmed on the sole ground that the death of Fried was caused "by the wilful act of a third person directed against the employee for reasons personal to the employee," and therefore was not compensable.

On a contested question of fact, where there is evidence to support the finding of the Industrial Board, its finding of such facts is final and can not be reviewed. *Georgia Casualty Co.* v. *Martin,* 157 *Ga.* 909, 915 (122 S. E. 881) ; *Independence Indemnity Co.* v. *Sprayberry,* 171 *Ga.* 565 (156 S. E. 230) ; *Ocean Accident & Guarantee Corporation* v. *Farr,* 180 *Ga.* 266, 270 (178 S. E. 728). The evidence in this case shows that Theodore D. Fried was employed by Fried's Garage as manager of the tire department. As such manager he had exclusive charge of sales and collections, and had no certain hours of duty, being allowed to work at any time he pleased. Some time before April 25, 1939, Fried had sold some tires to one T. P. Woodward on credit, for which he had not col-

lected.   In the afternoon of April 25 Fried went to a gasoline station owned and operated by Gordon Bush, in the city of Macon, where he hoped to contact Woodward.   This was a station where Woodward at times traded.   Fried asked Bush whether he knew where Woodward was, and was told that Woodward had not been in the station that day.   Fried left, and about four o'clock that afternoon he returned to inquire a second time about Woodward, and was told that Woodward had been to the station since Fried's first visit, and that, on being advised that Fried was looking for him, Woodward said he was going to Cordele, to get some money with which to pay for the tires.   Fried then left.   Woodward lived at the same house as did Bush, which was the home of the sister of Lawrence Kane, a bookkeeper for Bush.   About half after eight o'clock that night Fried drove up in his car with his wife, parked in front, and went into the station.   His wife remained outside.

The above summary from the opinion of the Court of Appeals is a correct statement of the preliminaries to the final event.   The substance of the testimony of witnesses for the respondents tended to show the following:   Bush was at his office at 8:30 o'clock in the night of the day on which all of the events transpired, and was eating supper.   When Fried came in he was angry, and demanded to know where Tommie Woodward was.   Bush said, "I told you this afternoon Tommie had gone to Cordele."   Fried replied, "You tell Tommie Woodward I am going to send the sheriff down for him."   When he said that, an employee of Bush said:   "You can't send a sheriff for anybody.   If you put everybody in jail that owes bills, there wouldn't be enough jails to hold half of them."   Fried was very angry and cursing and disrespectful to those in the office of Bush.   His profanity was very pronounced, and a fight was threatened between the employee of Bush and Fried, which Bush quieted down by saying:   "Let's not have any trouble at all."   Then Fried entered into a heated controversy with a customer of Bush, who happened to be in the office, and Bush asked Fried several times to leave his office, which Fried refused to do; and then Bush shoved him out of the door of his office, in consequence of which Fried, being afflicted with heart disease, died that night.   When Fried got on the sidewalk he said, "If I wasn't a sick man I would fight the hell out of you."   Bush testified that he would have liked to see Fried collect his money, and that Fried's brother had offered him employ-

ment, but the conduct of Fried, the apparent dispute by Fried of Bush's statement that Woodward had gone to Cordele, the very profane language used by Fried, his general discourtesy, and his refusal to leave Bush's office when ordered several times to do so, caused Bush to push Fried out of his office.

The question is whether, under these facts as found by the director and board of the Industrial Commission, the accidental injuries resulted from the "wilful act of a third person directed against the employee for reasons personal to the employee," and therefore was not compensable under the Code, § 114-102. The Court of Appeals of Georgia has very aptly defined the term "arising out of" the employment, as follows: "It 'arises out of' the employment, when there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury. Under this test, if the injury can be seen to have followed as a natural incident of the work, and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment, then it arises 'out of' the employment. But it excludes an injury which can not fairly be traced to the employment as a contributing proximate cause, and which comes from a hazard to which the workmen would have been equally exposed apart from the employment. The causative danger must be peculiar to the work. . . It must be incidental to the character of the business, and not independent of the relation of master and servant." *New Amsterdam Casualty Co.* v. *Sumrell,* 30 *Ga. App.* 682, 688 (118 S. E. 786); *Liberty Mutual Insurance Co.* v. *Neal,* 55 *Ga. App.* 790, 800 (191 S. E. 393). In another case where a drapery hanger was required to travel on a train and was shot by a passenger in an unprovoked assault, in holding that his death was not compensable, the Court of Appeals said: "It is not enough to say that the accident would not have happened if the servant had not been engaged in the work at the time, or had not been in that place. It must appear that it resulted from something he was doing in the course of his work, or from some peculiar danger to which the work exposed him. . . The most that can be said is that the injury would not have occurred but for claimant's employment bringing him to the time and place of the altercation between the conductor and the pas-

senger which precipitated the shooting. . . There must be a causative connection between the accident and the employment. It must arise 'out of' the employment." *Maryland Casualty Co.* v. *Peek*, 36 *Ga. App.* 557, 559-60 (137 S. E. 121). This court, in *Pinkerton National Detective Agency* v. *Walker*, 157 *Ga.* 548, 550 (122 S. E. 202), said, while holding the employer liable: "It is plain that it was the intention of the legislature to protect employers from liability in cases where injury resulted to the employee, even though he was in the course of his employment, because of personal ill-will towards the employee, 'for reasons personal to [or against] such employee.'"

In the instant case Fried was ordered out of Bush's office, and in refusing to go he became a trespasser. He became engaged in angry dispute with Bush's customer. He used violent and profane language. He nearly started a fight with one of Bush's clerks. His visit to Bush's office suggested doubt as to the truthfulness of Bush's statement that Woodward, the debtor, had gone to Cordele. It is manifest that the visit to Bush's office for the purpose of collecting the debt had no connection with the act of Bush in pushing Fried out of the house, which resulted in his death  It must be concluded that the unfortunate death of Fried resulted from "the wilful act of a third person directed against an employee for reasons personal to such employee." Accordingly the judgment of the Court of Appeals is

*Affirmed. All the Justices concur except Grice and Duckworth, JJ., who dissent.*

GRICE, Justice. A careful examination of the entire record, including the opinion of the Court of Appeals and the briefs of opposing counsel, aided by the discussion and exchange of views of associates around the conference table when this case was being considered en banc, both in considering the application for certiorari and afterwards, at which times vital portions of the record were read, reread, and commented upon by different members of the court, has left me with the conviction that the judgment of the Court of Appeals should be reversed because there is no evidence to justify the finding made by the Industrial Board. The crux of the case is, whether the injury arose out of the employment, or whether it should be excluded as one "caused by the wilful act of a third person directed against an employee for reasons personal

to such employee." Code, § 114-102. In other words, should the quoted provisions of law be construed to apply to the undisputed facts here presented? Fried was a collector. Woodward was the debtor. The object of Fried's three trips to Bush's place of business was to locate Woodward, who lived at the same house as did Bush, and occasionally at least might be found at Bush's filling-station. His entire conversation the whole of the time he was there was concerning Woodward and the account he owed his employer. The question of compensation for the injury which it was found resulted in Fried's death is not to be determined by an answer to the inquiry whether his language was profane, his conduct overbearing, his manner antagonistic, and his whole demeanor calculated to irritate those on the premises; but under the present state of the record the only question is, did his injury arise out of the employment? According to the record, what occurred immediately before the assault was as follows. Bush testified: "The next part of the conversation was betwixt he and a customer of mine, Freeman. When he and Freeman got in a *heated argument,* I got mad and I got up and told him to get out, that he had already worried me too much about Tommie Woodward already, and I wanted him to get out, and I asked him several times to get out, and he didn't get out and I put him out." Bush then testified that Mr. Fried used six or eight curse words. Bush was then asked: "When he turned to Mr. Freeman, he was one of your customers?" The witness answered, "Yes, sir." Next we have the following: Q. "Did he use any curse words to him (Freeman)?" A. "Yes." Q. "Was it then that you got mad?" A. "That's when I got mad. I didn't appreciate him coming down a third time after I told him Woodward was out of town; *that was disputing my word.* I didn't want to have any trouble and *would not have had any trouble* if he hadn't started arguing with my customer." (Italics supplied.) On cross-examination Bush testified: Q. "You were sorter mad when he (Fried) came in there?" A. "Yes, I was." Q. "Then the argument started?" A. "That's right."

The witness Kane, who was bookkeeper for Bush, testified: "Right after Fried said what he did about sending the sheriff after Woodward, about that time one of our customers who was in there said, 'No, you couldn't get the tires without a court order.' He began to get in an argument about it. That customer was

C. B. Freeman." On cross-examination Kane was asked: Q. "Fried never said anything to Freeman until Freeman said something to him; he wasn't talking to Freeman?" Kane answered: "Freeman told him he couldn't have a fellow arrested about the tires." He was then asked: "Fried had not been talking to Freeman?" and Kane answered, "No, sir." It is true that Bush in another portion of his evidence testified as follows: Q. "What was the occasion to get him out?" A. "To get him out on account of his actions." Q. "On account of his personal actions?" A. "On account of his personal actions." Q. "Was it anything to do with collecting a bill then?" A. "No, sir. I don't blame him from [for] trying to collect the bill. I surely don't." Q. "The way he acted that night was why you pushed him out?" A. "His actions was what caused me to push him out of the station." Taken as a whole and in connection with the other portion of his testimony, I do not think that this justified the conclusion of the commission that the assault was for personal reasons. The witness had narrated what Fried had said and done. The whole was directed against Woodward, not Bush. While Fried at this time used much profanity, none of it was directed toward Bush, nor had he attempted to lay hands on Bush or to pick a quarrel with him. The words, "His actions was what caused me to push him out of the station," can have no other rational meaning than that the manner in which Fried was pursuing Bush, and the method used by him, in the hope that Woodward's acquaintances and fellow roomers would repeat it to Woodward, offended Bush and caused him to attack him, not for reasons personal to Fried.

The claimant should not be denied compensation merely because the injury was occasioned by an assault made on Fried by a third person who was displeased at the manner in which the employee was then and there pursuing the business of his employer that he was engaged to perform, the employee not having attacked the third party, made no attempt to do so, applied to him no epithet or word of abuse, or otherwise indicated any unfriendliness to him. Nothing occurred to arouse his anger except his loud talking and the use of profanity, all of which was done in the pursuit of his master's business. It was for this and this alone that Bush shoved Fried—a man he testified he had never known personally—out of the filling-station. The injury he thereby received arose out of, as

well as in the course of, his employment, and his seizure and expulsion by Bush was not an "injury caused by the wilful act of a third person directed against an employee for reasons personal to the employee," within the meaning of the Code, § 114-102, but instead the third person's anger aroused by the manner and method of Fried in trying to locate Woodward, and to collect out of him a debt he owed his (Fried's) employer, it being Fried's duty to try to collect it. Let us suppose this case: In the days when auto-trucks had not supplanted horse-drawn vehicles as a means of transporting merchandise from one part of town to another, a furniture dealer ordered his drayman to deliver a sofa and chairs to a customer. In pursuance of his employment and in obedience to orders the employee drove on the premises of the customer, but had not reached the unloading point, when the mule he was driving balked and would go no farther. The driver spoke loudly about the animal's behavior, interspersing his remarks with profanity. The mule persisting in his stubbornness, the drayman unmercifully beat him with a cowhide whip. The purchaser of the furniture, who was standing by, protested to the servant about his conduct. all of the latter's words and actions, however, being directed to the accomplishment of that which his master had engaged him to do. Let us suppose that his language was sinful, his manner unbecoming, and his severe beating of the beast amounted to a violation of the criminal statute against cruelty to animals. Continuing therein, the owner of the premises became angry, and made an assault on him, thereby inflicting an injury upon him. The foregoing facts appearing without dispute, would a court refuse compensation because in a portion of the testimony of the assailant he stated, in answer to the question, "What was the occasion of your assaulting him?" he answered, "On account of his personal actions. It had nothing to do with his trying to deliver the furniture?"

In the record appears an opinion by the accomplished and experienced jurist who presided in the superior court on the hearing of the appeal from the findings of the board, Honorable Malcolm D. Jones. Omitting that part of Judge Jones' opinion which deals with issues which are no longer in the case, it is as follows: "This case comes before the court on appeal from the finding of the Board of Industrial Relations. Briefly stated the evidence shows: Theodore D. Fried was an employee of Fried's Garage, a corporation. This

employee had entire charge of sales and collections for tires sold by the company. As such employee he sold to one Woodward certain tires on credit and it was his duty to collect this account. The board found as a fact that Fried suffered from deafness which might have partially accounted for his loud tone of voice, but he was not too deaf to engage in conversation and argument with persons present. Endeavoring to locate Woodward, he made three visits to Bush's filling-station, at 2, 4, and 8 o'clock, p. m., all the same evening. On the last visit Bush became angered at Fried's repeated calls and his profanity, which referred to Woodward alone. Bush lost his temper and assaulted Fried, 'throwing him out' of the filling-station. The board ruled that this assault 'precipitated' an attack of coronary thrombosis from which Fried died several hours later, and that his death was caused by accidental injuries arising in the course of his employment. But the board also found that Fried's conduct amounted to the violation of a penal statute, viz., Code section 26-6303. The statute referred to makes it a misdemeanor to use 'to or of another, and in his presence, opprobrious words or abusive language tending to cause a breach of the peace.' The law contains other inhibitions against certain language used on street cars or in the presence of females, not pertinent to this case. The statute cited has no application here, because the evidence shows without contradiction that no abuse or profanity was used to Bush or any one else, who was present, but was directed solely toward Woodward, who was in Cordele, sixty-five miles south of Macon. According to the law of Georgia, offensive language is penalized only when used 'to another of another and in his presence.' The decision of the Supreme Court in *Mitchell* v. *State*, 41 *Ga.* 527 (3) (4), settles the proposition that offensive words do not justify any assault and battery unless used in the presence of another. While the principle ruled in the *Mitchell* case has several times been attacked (see Judge Fish's dissent in 116 *Ga.* 963 [43 S. E. 463, 60 L. R. A. 559]), it has never been overruled, and was definitely reviewed and adhered to in 137 *Ga.* 168 [73 S. E. 81]. See also 59 *Ga. App.* 51, 52 [200 S. E. 213].

"It will also be noted that Code section 26-6304, immediately following the section on which the board makes its criminal charge against a dead man, provides that the offenses mentioned in 26-6303 shall be 'inquired into only' after true bill returned by

the grand jury. Code section 105-1801 provides: 'In every case of tort, if the defendant was authorized by law to do the act complained of, he may plead the same as a justification.' Can any court 'inquire into' the guilt or innocence of Fried under section 26-6303 *before* the grand jury returns a true bill? Suppose some court should find him guilty and the grand jury afterwards returned a no bill? If the superior court could not try him on accusation, can the Board of Industrial Relations do so? It follows as a matter of law that Fried was not the aggressor in the justifiable assault and battery which precipitated his heart attack. The board also found that Fried stepped outside the scope of his employment when he remained in the filling-station for some ten or fifteen minutes, arguing with the owner and other persons present and using loud and profane language.

"Starting with the premise that the burden of proof is on the defendants (Code section 114-105), there is not a vestige of evidence that Fried was at any time, prior to the assault, acting outside the scope of his employment. As already found by the board, he was in full charge of the tire department. He alone made sales, and he alone was charged with the duty of collecting for those sold. The tires to Woodward were delivered to him under a retention title contract and in collecting the purchase-price Fried was as truly preserving assets of his employer as if he had saved the tires from being burned or stolen. Fried was trying to find Woodward. He told Bush at 2 o'clock one afternoon that he wanted to see Woodward. 'In a little bit after he left Woodward came in.' See evidence p. 36. Two hours later Fried came back and was told by Bush that he had seen Woodward, that Woodward said he was going to Cordele to get the money and pay for the tires; that he had 'passed up' with Bush and gone to Cordele. By this time it must have been apparent to Fried or to any man of ordinary intelligence that he had selected the right place for making contact with his debtor; and this conclusion is not weakened by the fact that Bush and Kane, one of Bush's employees, both lived in the same house with Woodward. Having failed to make direct contact with Woodward, the next best thing to do was to get word to Woodward that if he didn't pay for the tires the sheriff would be sent after him. So at 8 p. m. of the same day we find Fried back at Bush's filling-station telling Bush and Kane, both of whom lived in the same

house with Woodward, that he, Fried, was going to send the sheriff after Woodward unless he paid for the tires. There is not a vestige of evidence in the record that Fried talked about anything except the collection of his employer's account. Up to the very minute of the assault this was the burden of his talk, argument, abuse, profanity or whatever you may call it. Immediately before the assault on Fried, Bush said, 'I got mad and told him to get out, that he had worried me too much about Tommy Woodward. He didn't get out, and I put him out.' Lawrence Kane, another eye-witness, swore: 'When Fried came in he said, "Where is Tommy Woodward?" Gordon (Bush) looked up and said, "I told you this afternoon he had gone to Cordele." When Bush told him he (Woodward) had gone to Cordele, he (Fried) said, "I will be damned if I am not going to send the sheriff over there to get him." Bush told Fried, "I would like for you to get out of this place. You have been worrying me about this. Tommy doesn't stay here." Bush got him by the belt, and literally threw him out of the door.' The evidence of C. B. Freeman, a customer in the filling-station and another eye-witness of the assault, was to the same effect. Carl Booth was the only other eye-witness, and his evidence tallied exactly with that of Kane. (Record of evidence p. 54.)

"This evidence authorizes the conclusion that at the very time Fried was assaulted he was vigorously and profanely trying to get word to Woodward that his failure to pay for the tires would put him in an awkward situation. There is no other rational conclusion to be drawn from the record. Nor can there be the least doubt that the unjustifiable assault made on Fried was caused by the method which Fried adopted for protecting his employer's property. No matter what mistakes he made in good taste, in grammar or in judgment, his mistakes are not comparable with those of his assailant. The Industrial Board found that Fried's death was due to his own wilful misconduct. The wilful misconduct which will bar recovery under the workmen's compensation act has been carefully and accurately described by the Supreme Court in 169 *Ga.* 341, 342 [150 S. E. 208]. 'Wilful misconduct involves intentional, deliberate action with a reckless disregard of consequences; something less than self-infliction of injury but greater than gross negligence or wanton carelessness, the inten-

tional doing of something either with the knowledge that it is likely to result in serious injury or with reckless disregard of its probable consequences.' There is not a particle of evidence in the record to show that Fried knew that his death would be a probable consequence of cursing in the presence of Bush and Kane. Fried made no resistance, and, as a matter of law, mere words without any other act or show of evidence will under no circumstances justify an assault and battery resulting in death. It is manifest from the evidence in the record that neither Bush nor Fried had any reason whatever to anticipate that the violent and unexpected action of Bush would result in Fried's death. It was an accidental injury, as ruled by the director (see page 5 of the director's finding) which was adopted as the award of the full board. 'This director rules that the accidental injury arose in the course of his employment.'

"For the reasons stated it is ordered and adjudged that the injury complained of is compensable, that the facts found by the board can not support their conclusion that the accidental injury was not compensable, and that there is not sufficient competent evidence to warrant the order or decree complained of. It is therefore considered, ordered, and adjudged that the award of the Board of Industrial Relations, denying compensation, be and the same is hereby overruled and reversed, and it is adjudged that compensation is allowable to the claimant."

Mr. Justice Duckworth concurs in this dissent.