NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.



SUPREME COURT OF GEORGIA
Case No. S24C1320

February 18, 2025

The Honorable Supreme Court met pursuant to adjournment.

The following order was passed:

ATLANTIC GAMES, INC. v. GEORGIA LOTTERY CORPORATION.

The Supreme Court today denied the petition for certiorari in this case.

*All the Justices concur.*

Court of Appeals Case No. A24A0279

**SUPREME COURT OF THE STATE OF GEORGIA**
Clerk's Office, Atlanta

I certify that the above is a true extract from the minutes of the Supreme Court of Georgia.
Witness my signature and the seal of said court hereto affixed the day and year last above written.

, Clerk

PETERSON, Presiding Justice, concurring.

I concur in the Court's denial of certiorari in this case. Atlantic Games argues that the General Assembly's delegation of rulemaking authority to the Georgia Lottery Corporation in this case was without clear statutory guidance in violation of the Georgia nondelegation doctrine, and asks us to reconsider our decision in *DOT v. City of Atlanta*, 260 Ga. 699 (398 SE2d 567) (1990). We have previously indicated interest in reconsidering that decision, and the nondelegation issues that Atlantic Games raises are important. But this case is not a good vehicle for reaching any of those issues, as the Court of Appeals did not address them below. Nevertheless, I take this opportunity to explain Georgia's nondelegation doctrine and why *DOT* appears impossible to reconcile with that doctrine's historic contours.[1]

---

[1] Although nondelegation issues can arise as a result of the action of any governmental entity vested by the Georgia Constitution with governmental power, the prototypical case involves an act of the General Assembly challenged as delegating legislative power to an executive branch agency. For simplicity, I generally will use that single context as representing all the other contexts throughout this opinion.

1. *Constitutional basis for the nondelegation doctrine.*

The nondelegation doctrine derives from the fact that the Georgia Constitution vests specific powers in specific government entities;[2] at its core, the doctrine simply means that when the Georgia Constitution vests power in a governmental entity, that power is to be exercised only by that entity. We have characterized this principle as critically important to our system of ordered liberty: "To permit the General Assembly to abdicate and transfer to administrative agencies of government essential legislative functions, would strike down our constitutional system, and inaugurate the police state, condemned by every advocate of individual liberty and freedom." *Glustrom v. State*, 206 Ga. 734, 740 (58 SE2d 534) (1950). As between branches of state government, this principle is best understood through a general structural

---

[2] See Ga. Const. of 1983, Art. III, Sec. I, Par. I ("The legislative power of the state shall be vested in a General Assembly which shall consist of a Senate and a House of Representatives."); Ga. Const. of 1983, Art. V, Sec. II, Par. I ("The chief executive powers shall be vested in the Governor. The other executive officers shall have such powers as may be prescribed by this Constitution and by law."); Ga. Const. of 1983, Art. VI, Sec. I, Par. I ("The judicial power of the state shall be vested exclusively in the following classes of courts . . . .").

separation-of-powers lens: when the Georgia Constitution vests one branch with power, by implication that means that branch cannot give its power to another branch.

Within the universe of nondelegation cases, I see two distinct subcategories that each provide an additional constitutional basis. First, the text of the Georgia Constitution's Separation of Powers Paragraph[3] expressly prohibits persons with power of one branch of state government from *exercising* any power that is vested in either of the other two branches of state government. See, e.g., *Campbell v. Farmer*, 223 Ga. 605, 607 (157 SE2d 276) (1967) (striking down statute delegating legislative taxing power to executive branch agency as violation of separation of powers provision found in Ga. Const. of 1945, Art. I, Sec. I, Par. XXIII). Second, principles of self-government and state sovereignty[4] prohibit a government entity in

---

[3] See Ga. Const. of 1983, Art. I, Sec. II, Par. III ("The legislative, judicial, and executive powers shall forever remain separate and distinct; and no person discharging the duties of one shall at the same time exercise the functions of either of the others except as herein provided.").

[4] See Ga. Const. of 1983, Art. I, Sec. II, Par. I ("All government, of right, originates with the people, is founded upon their will only, and is instituted

which the Georgia Constitution has vested power from delegating that power to entities outside Georgia government, such as private parties, other state governments, and the federal government.[5] See,

---

solely for the good of the whole. Public officers are the trustees and servants of the people and are at all times amenable to them."); Ga. Const. of 1983, Art. I, Sec. II, Par. II ("The people of this state have the inherent right of regulating their internal government. Government is instituted for the protection, security, and benefit of the people; and at all times they have the right to alter or reform the same whenever the public good may require it.").

[5] We have in many cases invalidated delegations of power from the General Assembly to Georgia local governments. Some of those cases cite as the source of the constitutional rule only the provision of the Georgia Constitution that vests the legislative power in the General Assembly; these may represent the nondelegation doctrine in its purest form. See, e.g., *Jamison v. City of Atlanta*, 225 Ga. 51, 51 (1) (165 SE2d 647) (1969) (striking down statute attempting to delegate "strictly legislative" power of fixing municipal corporate limits). Sometimes we have also suggested separation-of-powers reasons for such cases. See, e.g., *Turner County v. City of Ashburn*, 293 Ga. 739, 742-749 (749 SE2d 685) (2013). I have previously articulated my view that the Georgia Constitution's Separation of Powers Paragraph does not apply to local governments. See *City of Union Point v. Greene County*, 303 Ga. 449, 461-463 (812 SE2d 278) (2018) (Peterson, J., concurring) (noting line of caselaw beginning in 1910 holding that the Georgia Constitution's Separation of Powers Paragraph does not apply to local governments, as well as our inconsistent application of that caselaw). But I have also noted the possibility that at least some "separation-of-powers principles are found in more than simply the Separation of Powers [Paragraph]; like the United States Constitution (which lacks such a [Paragraph])," it is possible that such principles applicable even to local governments might "also arise from the nature and structure of the Georgia Constitution." Id. at 462 (Peterson, J., concurring). In any event, although these local government cases are all relevant to understanding the nature and application of the nondelegation doctrine, it's important to recognize that their precise holdings have often been abrogated by later changes to the Georgia Constitution's provisions regarding local governments.

e.g., *Rogers v. Med. Ass'n of Georgia*, 244 Ga. 151, 153 (2) (259 SE2d 85) (1979) (striking down statute delegating to private organization the power to appoint members to a state board when Constitution "mandate[d] that public affairs shall be managed by public officials who are accountable to the people"); *Green v. City of Atlanta*, 162 Ga. 641 (5) (135 SE 84) (1926) ("The city of Atlanta cannot abandon its legislative power and confer it upon the federal authorities.").

2. *Nondelegation analytical principles.*

I see in our caselaw what is essentially a three-step test to evaluate whether the nondelegation doctrine has been violated. First, we determine whether a statute or other allegedly delegating government action actually purported to delegate any power. Second, if so, we determine whether the delegating entity had that power in the first place. And third, if so, we determine whether the delegation was permissible. I will take each step in turn.

A. *Whether government action has actually delegated any power.*

An executive branch administrative agency has "only such

6

powers as the Legislature has expressly or by necessary implication conferred on it[,]" and "such implied powers only as are reasonably necessary to execute the express powers conferred." See *Bentley v. State Bd. Of Med. Exam'rs*, 152 Ga. 836, 838 (111 SE 379) (1922). Thus, if a statute does not either expressly or implicitly confer the powers alleged to have been improperly delegated, the alleged delegation has not actually occurred and our inquiry ends. See, e.g., *R.R. Comm'n of Georgia v. Macon Ry. & Light Co.*, 151 Ga. 256, 258 (106 SE 282) (1921); *Zuber v. S. Ry. Co.*, 9 Ga. App. 539, 544-545 (71 SE 937) (1911) (holding that because "the Legislature had not paved the way by furnishing in advance the legislative object on which the administrative act was to operate," the railroad commission's regulations "must fall"). Because even implied delegations must derive from express authority, many cases start and end at this step.[6]

---

[6] See, e.g., *North Fulton Med. Ctr. v. Stephenson*, 269 Ga. 540, 542-544 (501 SE2d 798) (1998) (striking down regulation because it conflicted with statute and agencies cannot "enlarge the scope of, or supply omissions in, a properly enacted statute[,]" "change a statute by interpretation," or "establish

This step is also where early applications of the doctrine of constitutional avoidance appear: "This court will never presume that the General Assembly intended to enact an unconstitutional

---

different standards within a statute that are not established by the legislative body"); *Dep't of Hum. Res. v. Anderson*, 218 Ga. App. 528, 529 (462 SE2d 439) (1995) (invalidating administrative rule attempting to add a requirement inconsistent with the "clear authority of the statute"); *HCA Health Servs. of Ga., Inc. v. Roach*, 265 Ga. 501, 502-503 (2) (458 SE2d 118) (1995) (striking down agency's regulation in excess of authority because agency had "no constitutional authority to legislate[;]" its power was limited to the performance of an administrative function: "to promulgate rules for the enforcement of the General Assembly's enactments"); *Rielli v. State*, 174 Ga. App. 220, 222 (3) (330 SE2d 104) (1985) ("An administrative rule promulgated without statutory authority is invalid."); *Local Div. 732 v. Metro. Atlanta*, 253 Ga. 219, 222 (3) (a) (320 SE2d 742) (1984), overruled in part on other grounds in *Rodriguez de Quijas v. Shearson*, 490 U.S. 477 (109 SCt 1917, 104 LE2d 526) (1989) (without "express statutory authority," MARTA lacked "the power to delegate to arbitrators the authority to determine the conditions of employment of the agency's employees"); *O'Neal v. Georgia Real Estate Comm'n*, 129 Ga. App. 211, 212 (199 SE2d 362) (1973) (Commission lacked authority to adopt rule that amended or repealed constitutional or statutory rights); *Gartrell v. McGahee*, 216 Ga. 125, 128 (1) (114 SE2d 871) (1960) (striking down delegatee's attempt to delegate power delegated to it by statute because the statute conferred limited that authority expressly to the delegatee); *Crawley v. Seignious*, 213 Ga. 810, 812-813 (102 SE2d 38) (1958) (striking down regulation that conflicted with the statute); *Hunt v. Glenn*, 206 Ga. 664, 667 (58 SE2d 137) (1950) (The Board, "as an administrative agency of the State . . . may make rules and regulations which are in harmony with the purposes of the law, but it is without authority to make any rule or regulation which alters or limits the statute being administered."); *S. Co-Operative Foundry Co. v. Drummond*, 76 Ga. App. 222, 224 (45 SE2d 687) (1947) (delegatee was "a creature of the statute, and was established by the Legislature as an administrative body"; "[i]t has no inherent powers and no lawful right to act except as directed by the statute"; "[i]t may exercise its rule making powers under and within the law, but not outside of the law or in a manner inconsistent with the law").

law. Where the language of an act is susceptible of a construction that is constitutional, and another that would be unconstitutional, that meaning or construction will be applied which will sustain the act." *Glustrom*, 206 Ga. at 739. Many close cases end with the application of this doctrine. See, e.g., *Premier Health Care Invs., LLC v. UHS of Anchor, LP*, 310 Ga. 32, 49-54 (3) (f) (849 SE2d 441) (2020) (construing statute narrowly to avoid interpreting statute as delegating impermissible authority to the Department of Community Health); *Glustrom*, 206 Ga. at 739-740 (resolving nondelegation challenge by interpreting statute as not delegating impermissible authority to State Revenue Commissioner); *Southern Co-op. Foundry Co. v. Drummond*, 76 Ga. App. 222, 224-225 (45 SE2d 687) (1947) (resolving nondelegation challenge by interpreting regulation as inconsistent with authority conferred by statute).

We also see at this step what appears to be a version of the major questions doctrine, which may not be all that different from constitutional avoidance: "The power to permit a street-railroad company to discontinue or abandon service upon a particular line or

9

upon a particular part of its system is so extraordinary as to preclude the idea that the General Assembly would have left such power to implication merely. It is more reasonable to assume that the General Assembly would have given such power in express terms." *Railroad Commission*, 151 Ga. at 258-259 (2).

B. *Whether the delegating governmental entity possesses the delegated power in the first place.*

Even when delegations are permissible, one can delegate no more than the power one possesses. Sometimes, a governmental actor seeks to delegate a power it doesn't have. In such cases, we strike down the statute not as a matter of nondelegation, but because it was simply beyond the power of the government actor. In a case involving a nondelegation challenge to a statute delegating taxing power over a particular commodity to a state executive branch agency, we explained as follows:

> [Because] it is not a tax which the General Assembly has constitutional power to impose only on that particular agricultural commodity for any one of the purposes enumerated in the aforementioned provision of the Constitution, it is elementary that the General Assembly

10

> is without constitutional authority to create an instrumentality of the State and clothe it with power to impose a tax on such commodity, a power which it does not itself possess. The State can never do indirectly that which it cannot lawfully do directly.

*Agricultural Commodities Authority v. Balkcom*, 215 Ga. 107, 109 (1) (109 SE2d 276) (1959) (striking down statute as beyond the power of the General Assembly). See also, e.g., *Ogletree v. Dozier*, 59 Ga. 800, 801-802 (1877) (striking down statute authorizing county commissioners to hire out prisoners, on the grounds that the power to hire out prisoners "belongs, if it be exercised at all, to the governor"); cf. *City Council of Augusta v. Mangelly*, 243 Ga. 358, 361-362 (254 SE2d 315) (1979) ("[B]ecause the state may not do indirectly that which it cannot lawfully do directly[, ] the General Assembly must have express constitutional authorization for its act in allowing a county to impose a tax for a particular purpose.").

       C.    *Whether the delegation is permissible.*

If a statute delegates authority to an executive branch administrative agency, and the General Assembly actually has constitutional authority to legislate on the subject, we then move to

the final analytical step: whether the delegation was permissible. And in framing it in terms of "delegation," we've immediately gone at least sort of wrong.

The point of the nondelegation doctrine is that all power vested in a governmental entity by the Georgia Constitution is reserved for that entity to exercise itself. In the context of action by the General Assembly, that means that all of the State's legislative power must be exercised only by the General Assembly. If a statute delegates *legislative* power for an agency of another branch to exercise, by definition that's impermissible. So, in one sense, any "delegation" of power the General Assembly possesses (which is only the legislative power) is unlawful.

But the General Assembly *can* by law impose the responsibility to execute a particular law on a particular agency. That is, in fact, the nature of the executive power: to execute laws enacted by the General Assembly. See, e.g., Ga. Const. of 1983, Art. V, Sec. II, Par. II ("The Governor shall take care that the laws are faithfully executed . . . ."). So our caselaw that speaks of determining what

delegations are permissible may be better understood as determining whether a statute delegates legislative authority (and thus is impermissible), or merely legislates in a way that confers responsibility on a particular executive branch agency to execute that particular statute. See *Franklin Bridge Co. v. Wood*, 14 Ga. 80, 84 (5) (1853) (upholding statute challenged on nondelegation grounds because "no Legislative power is delegated to the Courts by the acts under consideration. There is simply a ministerial act to be performed — no discretion is given to the Courts").

Although "it is not easy to draw an exact line" between delegation of legislative power and legislation that merely identifies the executive branch agency responsible for executing a statute and gives that agency guidance in so doing, see *Southern Ry. Co. v. Melton*, 133 Ga. 277, 285 (65 SE 665) (1909), the line in our historic precedent turns on the extent to which the statute provides objective guidelines to direct the agency's exercise of power; sometimes, that's best thought of as similar to the requirements enforceable in mandamus. See *Franklin Bridge Co.*, 14 Ga. at 84 (5) (noting that

13

the nature of the duties assigned under the statute "is made obligatory upon the Courts; and should they refuse to discharge it, a mandamus would lie to coerce them"); *Phinizy v. Eve*, 108 Ga. 360, 361-363 (1) (33 SE 1007) (1899) (upholding statute where "[e]very step [was] prescribed" because the General Assembly declared among other things "the subjects of taxation; when, how, and by whom and to whom, returns [we]re to be made; when and by whom the rate must be calculated; and when and by whom and to whom the money must be paid").[7] In other words, statutes that impose on the agency such clear requirements or conditions that the agency essentially executes a ministerial duty clearly fall within the bounds

---

[7] See also *City of Calhoun v. North Georgia Elec. Membership Corp.*, 233 Ga. 759, 768-770 (5) (b) (213 SE2d 596) (1975) (statute contained sufficiently definitive standards when its purposes were appropriate, other provisions put those purposes into effect completely and thoroughly, and it limited the delegatee's authority to applying standards set forth in the act, making rules and regulations according to such standards, and administering them); *Holcombe v. Georgia Milk Producers Confederation*, 188 Ga. 358, 365 (4) (3 SE2d 705) (1939) ("[O]ne of the most important tests in determining whether a law amounts to an invalid delegation of legislative power is the completeness of the statute as it appears when it leaves the hands of the legislature[.]"); *Bohannon v. Duncan*, 185 Ga. 840, 842-843 (3) (196 SE 897) (1938) (statute did not unlawfully delegate legislative authority because it "sufficiently fix[ed] the policy, general rules, and methods by which the [delegatee] should exercise its functions").

of permissible "delegations" (if we must call them that). See, e.g., *Bedingfield v. Parkerson*, 212 Ga. 654, 659 (2) (94 SE2d 714) (1956) (statute permitting county boards of education to reorganize schools in their jurisdiction conferred "merely administrative powers" that were and had been a function of county boards of education).

Similarly, we have upheld statutes that distinguish between "the power to pass a law" — which necessarily requires discretion as to what the law shall be — "and the power to adopt rules and regulations to carry into effect a law already passed" — which requires some — but far less — discretion as to the law's execution, see *Georgia R.R. v. Smith*, 70 Ga. 694, 699 (1) (1883); statutes that are complete when they leave the hands of the legislature, see *Telford v. City of Gainesville*, 208 Ga. 56, 63 (1), 65-67 (3), 67 (4) (65 SE2d 246) (1951); and statutes that take effect upon the happening of some event, see *City of Brunswick v. Finney*, 54 Ga. 317, 324-325 (6) (1875).

By contrast, our historic precedent consistently has struck down statutes that delegate broad discretion, see, e.g., *Georgia*

*Franchise Practices Comm'n v. Massey-Ferguson, Inc.*, 244 Ga. 800, 802 (4) (262 SE2d 106) (1979) (statutory guidelines that leave the agency "broad discretion" are insufficient) and *Richter v. Chatham County*, 146 Ga. 218, 219-221 (2) (91 SE 35) (1916) (striking down statute where General Assembly "made no effort to legislate anything in regard to the system of [voter] registration"); and statutes that leave "the authority to a ministerial officer to define the thing to which the statute is to be applied," see *Sundberg v. State*, 234 Ga. 482, 484 (216 SE2d 332) (1975) (striking down criminal statute delegating authority to designate "depressant or stimulant drug[s]" that the statute generally criminalized, because it "attempted to delegate . . . authority to determine what acts (the possession of such substances) would constitute a crime," even though statute provided some detail on this point).

In short, a statute conferring on an executive branch agency the authority to administer the statute survives a nondelegation challenge when the statute imposes clear, objective guidelines that cabin the agency's discretion in meaningful and judicially

16

enforceable ways. Although our historic caselaw does not require the elimination of all agency discretion, it does not permit much agency discretion. That caselaw has been frank about the difficulty of drawing a precise line at where some discretion becomes too much discretion, but the line definitely exists, and our Court has not hesitated to strike down statutes that have crossed it.[8] (And when

---

[8] See, e.g., *Mitchell v. Wilkerson*, 258 Ga. 608, 608-609 (372 SE2d 432) (1988) (striking down statute allowing others to specify grounds for recall election as "impermissible delegation of legislative authority" because the Constitution required the General Assembly to specify such grounds and "this [was] a mandate which the General Assembly [could] not escape"); *Campbell*, 223 Ga. at 607 (striking down statute seeking to delegate legislative power to levy taxes to programs because, although constitutional amendment authorized creation of programs, "it did not authorize the delegation of the State's taxing power" to them); *Howell v. State*, 238 Ga. 95, 95-96 (230 SE2d 853) (1976) (striking down criminal statute directing that "any person . . . who shall violate any of the rules or regulations promulgated by the [delegatee] shall be made guilty of a misdemeanor" because it gave a ministerial officer authority to define the thing to which the statute was to be applied); *Bibb County v. Garrett*, 204 Ga. 817, 826 (51 SE2d 658) (1949) (striking down statute that "by its own terms undertook to vest in the board 'full power and authority, in its discretion, to inaugurate, constitute, and administer pension and or other insurance benefits" (punctuation omitted; emphasis in original); *Long v. State*, 202 Ga. 235, 237 (42 SE2d 729) (1947) (striking down statute attempting "to authorize the county commissioners to make a law, by defining the act, the violation of which would be a misdemeanor" and to change and modify the terms of an existing penal statute by prescribing a speed limit according to their discretion); *Mosley v. Garrett*, 182 Ga. 810, 816 (187 SE 20) (1936) (striking down statute giving grand jury "uncontrolled and unguided" discretion in fixing a salary the Constitution required the General Assembly alone to set because the General Assembly could not delegate "essentially legislative" functions, including "uncontrolled and unguided discretion").

17

in the gray area, our step one constitutional avoidance doctrine often makes finer line-drawing unnecessary.)

3. *Interpretive principles make our historic caselaw critically important to determining the scope and nature of our current nondelegation doctrine.*

The relevant constitutional text of the various vesting clauses and the separation of powers paragraph in today's Georgia Constitution was materially identical (for all purposes relevant to nondelegation) through multiple previous Georgia constitutions.[9]

---

[9] A separation of powers provision has been in every Georgia Constitution, and has been carried forward without material change from its 1877 version to the current Constitution of 1983. See Ga. Const. of 1877, Art. I, Sec. I, Par. XXIII ("The legislative, judicial and executive powers shall forever remain separate and distinct, and no person discharging the duties of one, shall, at the same time, exercise the functions of either of the others, except as herein provided."); Ga. Const. of 1945, Art. I, Sec. I, Par. XXIII (same as 1877); Ga. Const. of 1976, Art. I, Sec. II, Par. IV (same as 1877); Ga. Const. of 1983, Art. I, Sec. II, Par. III (same as 1877 with changes to punctuation).

The legislative power vesting provision has been carried forward without material change since its initial appearance in the 1789 Constitution to the current Constitution of 1983. See Ga. Const. of 1789, Art. I, Par. I ("The legislative power shall be vested in two separate and distinct branches, to wit, a Senate and House of Representatives, to be styled, 'The General Assembly.'"); Ga. Const. of 1798, Art. I, Par. II (same as 1789 with changes to capitalization and punctuation); Ga. Const. of 1861, Art. II, Sec. 4917, Par. II ("The Legislative power shall be vested in a General Assembly, which shall consist of a Senate and House of Representatives."); Ga. Const. of 1865, Art. II, Sec. II

18

("The legislative power shall be vested in a general assembly, which shall consist of a senate and house of representatives, the members whereof shall be elected and returns of the elections made in the manner now prescribed by law . . . ."); Ga. Const. of 1868, Art. III, Sec. I, Par. I ("The Legislative Power shall be vested in a General Assembly, which shall consist of a Senate and House of Representatives, and until otherwise directed, the Members thereof, after the first Election, shall be elected, and the Returns of the Election made as now prescribed by Law."); Ga. Const. of 1877, Art. III, Sec. I, Par. I (same as 1861 with changes to capitalization and punctuation); Ga. Const. of 1945, Art. III, Sec. I, Par. I ("The legislative power of the State shall be vested in a General Assembly which shall consist of a Senate and House of Representatives."); Ga. Const. of 1976, Art. III, Sec. I, Par. I (same as 1945); Ga. Const. of 1983, Art. III, Sec. I, Par. I (same as 1945 with changes to capitalization).

The executive power vesting provision was carried forward without material change from the 1789 Constitution through the 1976 Constitution. See Ga. Const. of 1789, Art. II, Par. I ("The executive power shall be vested in a governor, who shall hold his office during the term of two years, and shall be elected in the following manner:"); Ga. Const. of 1798, Art. II, Par. I ("The executive power shall be vested in a governor, who shall hold his office during the term of two years, and until such time as a successor shall be chosen and qualified;"); Ga. Const. of 1861, Art. III, Sec. 4954, Par. 1 (same as 1798 with changes to capitalization); Ga. Const. of 1865, Art. III, Sec. I, Par. I ("The executive power shall be vested in a governor, the first of whom under this constitution shall hold the office from the time of his inauguration, as by law provided, until the election and qualification of his successor."); Ga. Const. of 1868, Art. IV, Sec. I, Par. I ("The Executive Power shall be vested in a Governor who shall hold his Office during the Term of four years, and until such time as a Successor shall be chosen and qualified."); Ga. Const. of 1877, Art. VI, Sec. I, Par. II (same as 1868 but changed term from four to two years and changes to capitalization); Ga. Const. of 1945, Art. V, Sec. I, Par. I (same as 1877 with changes to capitalization); Ga. Const. of 1976, Art. V, Sec. I, Par. I (same as 1945). A material change then occurred in the vesting clause as it appeared in our current Constitution of 1983, albeit a change not relevant to nondelegation: the 1983 Constitution was the first to vest in the Governor only the "chief" executive powers and expressly added a reference to other executive officers in the vesting clause. See Ga. Const. of 1983, Art. V, Sec. II, Par. I ("The chief executive powers shall be vested in the Governor. The other executive officers shall have such powers as may be prescribed by this Constitution and by law.")

Because these constitutional provisions from which the nondelegation doctrine is derived have remained the same over time, the nondelegation principles that we draw from our caselaw prior to the adoption of the 1983 Constitution form important context for understanding the scope of the 1983 Constitution's nondelegation doctrine. See *Elliott v. State*, 305 Ga. 179, 184 (II) (B) (824 SE2d 265) (2019); *Sons of Confederate Veterans v. Henry County Bd. of Commissioners*, 315 Ga. 39, 62 (2) (c) (iii) (880 SE2d 168) (2022). See also Nels S.D. Peterson, *Principles of Georgia Constitutional Interpretation*, 75 Mercer L. Rev. 1, 35 (2023) ("[T]he presumption flowing from a consistent and definitive construction could be understood as privileging pre-1983 constitutional precedent over post-1983 constitutional precedent, as the older precedent would be indicators of original meaning in ways that the newer

---

And the judicial power vesting provision has been carried forward since its initial appearance in the 1798 Constitution to the current Constitution of 1983. See *Sons of Confederate Veterans*, 315 Ga. at 46 (2) (a) (citing relevant constitutional provisions). The only real change that occurred was in the 1983 Constitution, which added the word "exclusively," although our caselaw appears to have read the prior vesting clauses as exclusive as well. See id.

precedent is not.").

4.    *DOT v. City of Atlanta is wrong and should be reconsidered.*

In the face of our historic caselaw about what constitutes sufficient guidelines, *DOT* is clearly an aberration. In *DOT*, this Court upheld a statute delegating to a state commission the power to approve the exercise of eminent domain (long understood to be part of the legislative power)[10] over public property if the commission found such a taking was "reasonable, necessary, and in the public interest." 260 Ga. at 700-702. The statute did so without providing any guidelines to guide the commission in determining when a taking was "reasonable, necessary, and in the public interest." Id. The Court held that the statutory requirement that the takings be "reasonable, necessary, and in the public interest" was

---

[10] See *Chestatee Pyrites Co. v. Cavenders Creek Gold Min. Co.*, 119 Ga. 354, 355 (1) (46 SE 422) (1904) ("The right of eminent domain is a sovereign right of the state. It is inherent in every sovereignty, and existed before constitutions were adopted. It lies dormant until the Legislature sets it in motion."). See also *S. Ry. Co. v. State Highway Dep't*, 219 Ga. 435, 441-442 (134 SE2d 12) (1963).

21

itself a sufficient guideline because "[i]n other cases we . . . found that delegations of the power of eminent domain such as that here contain sufficient guidelines." Id. at 703-704 (1) (citing *State v. Moore*, 259 Ga. 139 (376 SE2d 877) (1989); *Eaves v. Harris*, 258 Ga. 1 (364 SE2d 854) (1988); *Williamson v. Housing Authority of Augusta*, 186 Ga. 673 (199 SE 43) (1938)).

But these cases do not support this proposition. First, *Moore* and *Eaves* post-dated the adoption of the 1983 Constitution, so their holdings cannot form part of the context we consider as informing the original public meaning of that Constitution. Second, both of those cases included guidelines that were far more restrictive than the ones present in *DOT*. The statute in *Moore* provided that, before exercising discretion in designating certain roads for oversized vehicles and "to provide reasonable access requirements in compliance" with the statute, the delegatee "must first consider" mandatory guidelines set forth in the statute. 259 Ga. at 142 (8). And the statute at issue in *Eaves* permitted the Governor to suspend public official indicted for a felony "[i]f, and only if" an appointed

22

commission recommended suspension. 258 Ga. at 2. And third, neither of those cases grappled at all with our pre-1983 caselaw. *Williamson*, meanwhile, the only pre-1983 case *DOT* cited on this point, did not discuss guidelines at all, and it escapes me how we even came to cite it in *DOT* on this point. 258 Ga. at 680-681 (4). In short, *DOT*'s holding that a statute empowering an executive branch agency to wield legislative power subject only to the "guidelines" that the agency's decisions be "reasonable," "necessary," and "in the public interest" was unsupported by any case it cited and completely out of step with the many previous decisions of this Court enforcing a robust nondelegation doctrine. Although that historic caselaw is frank about the difficulty of line-drawing in a close case, that caselaw is clear that the line exists, and it requires far more than the empty "guidelines" present in *DOT*. In an appropriate case, we should seriously consider whether to overrule *DOT*.

Of course, stare decisis is an important principle of Georgia law. See *Cook v. State*, 313 Ga. 471, 508-520 (870 SE2d 758) (2022) (Peterson, J., dissenting); *Frett v. State Farm Employee Workers'*

23

*Comp.*, 309 Ga. 44, 62-65 (844 SE2d 749) (2020) (Peterson, J., dissenting). But stare decisis applies with less force in constitutional cases. See *Georgia Department of Natural Resources v. Center for a Sustainable Coast, Inc.*, 294 Ga. 593, 601 (2) (755 SE2d 184) (2014). And stare decisis also applies with less force to opinions that have not made a serious attempt at deciding the legal question at issue. See *Wasserman v. Franklin County*, No. S23G1029, 51 (II) (B) (1) (Ga. Jan. 28, 2025) ("Such precedents embody just the sort of 'arbitrary discretion' (whether actual or apparent) that can be especially harmful to the rule of law, see The Federalist No. 78, at 529 (Alexander Hamilton) (Jacob E. Cooke ed., 1961), so we are more open to replacing them with (ideally) carefully reasoned rules of decision that courts can apply evenhandedly to future cases."); *Ammons v. State*, 315 Ga. 149, 170-172 (1) (880 SE2d 544) (2022) (Pinson, J., concurring). As explained above, *DOT* may well be such an opinion. Although I do not prejudge the application of stare decisis to *DOT*, that opinion seems to me to have an uphill battle when we eventually reconsider it. And we should.